# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**OSCAR ARTURO
MACHADO-GALEANA, ET AL.**

**CR. NO. 15-32-JWD-EWD**

**JUDGE JOHN W. deGRAVELLES**

## RULING AND ORDER

### I. INTRODUCTION

Before the Court are three motions that seek to suppress evidence obtained through the use of wiretaps (the "Wiretap Motions"). The first Wiretap Motion, styled as a "Motion to Suppress Evidence Seized Through Wiretaps," was filed by defendant Oscar Arturo Machado-Galeana's current attorney, Martin E. Regan. ("Machado-Galeana's Motion," Doc. 416). The second Wiretap Motion, styled as a "Motion to Suppress Wiretap Evidence," was filed by Machado-Galeana's former attorney, Rusty M. Messer.[1] (Doc. 419). The third Wiretap Motion, styled as a "Motion to Suppress Evidence Seized Through Wiretaps," was filed on behalf of defendant Roy Martin Herrera Romero (collectively with Machado-Galeana, "Defendants"). ("Romero's Motion," Doc. 395). The Government opposes, ("Opposition," Doc. 435), and, on April 11, 2017, the Court held a hearing on the Wiretap Motions, (Doc. 450; *see also* Doc. 453 ("Hrg. Tr.")). Machado-Galeana, Romero, and the Government have also filed post-hearing memoranda in further support of their positions. (Docs. 461, 457, and 460, respectively).

After careful consideration of the law, the facts of this case, and the parties' arguments, for the reasons set forth below, the Wiretap Motions are **DENIED**.

---

[1] The arguments in the Wiretap Motion filed by Machado-Galeana's former attorney are identical in all relevant respects to those made in the Wiretap Motion filed by current counsel. In the interest of clarity, the Court primarily refers to and cites the Wiretap Motion filed by current counsel.

## II.    FACTUAL BACKGROUND

### A.  The First Wiretap Application

In November 2014, the Government filed an application to intercept wire and electronic communications occurring over cellular telephone number (225) 485-1386, used by Alexander P. Nava.  (*See* Doc. 435-1 at 1-2).  Chief Judge Brian A. Jackson approved the application, authorizing a thirty-day period in which to intercept communications.  (*See id.* at 12, 75). Attached to the application was the supporting affidavit of Charles Scott Courrege, a Task Force Officer with the Drug Enforcement Administration ("DEA").  (*Id.* at 18).  Courrege's affidavit described the following background:[2]

 On June 18, 2014, a cooperating source ("CS") who has provided information to the DEA since 2014 contacted an undercover agent ("UC-1"), telling UC-1 that the CS would introduce UC-1 to Nava, who was known to sell methamphetamine and was looking for customers in the Baton Rouge area.  (*Id.* at 28-29).  Later that day, the CS phoned UC-1 and introduced Nava, and Nava told UC-1 that he could supply UC-1 with "any quantity of methamphetamine he wished to purchase."  (*Id.* at 29).  Nava quoted prices to UC-1 and told UC-1 to contact him at (225) 485-1386 if he wished to purchase methamphetamine.  (*Id.* at 29-30).

On June 24, 2014, UC-1 called Nava and negotiated the purchase of an ounce of methamphetamine.  (*Id.* at 30-31).  Nava agreed to meet UC-1 at a gas station to conduct the sale, and UC-1 and another undercover agent ("UC-2") met Nava at the gas station and conducted the sale.  (*Id.* at 31-32).  Based upon information later obtained via subpoena, during the sale Nava contacted a phone with telephone number (225) 384-1879, for which Machado-

---

[2] When describing the content of Courrege's various affidavits and the arguments of the parties, the Court generally omits repeated references to what "Courrege alleged" or what "Machado-Galeana [or Romero or the Government] argues" where it is clear from context that a statement is an allegation rather than an established fact.

Galeana was listed as the subscriber. (*Id.* at 32). Agents also later located a car that Nava had used during the transaction; according to DMV information, at the time when the car was located it was parked at Machado-Galeana's residence near a car that Machado-Galeana owned. (*Id.* at 31, 33).

On July 9, 2014, UC-1 called Nava and negotiated the purchase of two ounces of methamphetamine at the same gas station. (*Id.* at 33). Before the meeting occurred, Nava informed UC-1 that his "cousin" would deliver methamphetamine on his behalf. (*Id.* at 34). Machado-Galeana later arrived at the gas station and conducted the sale. (*Id.*).

On July 11, 2014, Magistrate Judge Stephen Riedlinger signed an order authorizing the activation of a pen register on the (225) 485-1386 telephone. (*Id.* at 35).

On July 28, 2014, Nava and UC-1 negotiated a sale of two ounces of methamphetamine, plus an additional ounce to be paid for later. (*Id.* at 36). UC-1 and UC-2 went to the gas station, where Machado-Galeana later arrived and conducted the sale. (*Id.* at 36-37).

On August 18, 2014, Nava and UC-1 negotiated a sale of methamphetamine. (*Id.* at 39). During the course of their conversation, Nava texted UC-1 to say "U know? U dealing with the cartel now? U still want to do it[?]" (*Id.*). After UC-1 and UC-2 arrived at the gas station, Nava called UC-1 and asked UC-1 to follow him to another location. (*Id.* at 40). Nava and Machado-Galeana then arrived at the gas station, and UC-1 and UC-2 followed them to a convenience store, where the sale was ultimately conducted. (*Id.* at 40-41).

On September 2, 2014, Nava and UC-1 negotiated a sale of methamphetamine, which occurred at the same convenience store in the presence of Nava and Machado-Galeana. (*Id.* at 41-45). During the sale, UC-1 used an undercover vehicle that had a "trap," *i.e.*, a hidden

compartment used to conceal drugs and money, installed in the trunk; he later asked Nava to let him know if Nava was "interested in [a] trap install." (*Id.* at 43-45).

On September 24, 2014, UC-1 contacted Nava and arranged to pay for methamphetamine that had previously been "fronted" to UC-1. (*Id.* at 45). UC-2 met Nava at the gas station, provided Nava with money owed, and discussed future methamphetamine sales. (*Id.* at 45-46).

In addition to this background, Courrege's affidavit contained a section discussing why a wiretap was necessary, *i.e.*, why "normal investigative techniques" had failed to fully achieve the investigation's objectives, were unlikely to succeed if tried, or were too dangerous to be tried. (*Id.* at 53).

With respect to confidential sources, Courrege represented that confidential sources normally have "limited information, either furnished by a subject or learned secondhand from others," and that information provided by confidential sources would not result in a successful prosecution of all members of the drug trafficking operation. (*Id.* at 53). The sole CS developed in the case provided "valuable" information but did not have "enough access" to Nava, the CS could not advise agents about pending deliveries or the transportation of methamphetamine, and the CS had "no involvement" with narcotics trafficking. (*Id.* at 53-54). The CS was a "mere acquaintance" of Nava's and was not able to spend time around Nava to gain information or meet other members of the organization. (*Id.* at 54). The CS also had no information about money laundering activities conducted by Nava's organization. (*Id.* at 55). The CS was willing to testify at trial, but, absent evidence gathered via wiretap, the CS's testimony would be insufficient to convict all members of the organization. (*Id.* at 55-56).

With respect to controlled purchases, Courrege represented that the controlled purchases that had already been performed were useful, but they were "limited to what [was] occurring

only at the time and place of the controlled purchase." (*Id.* at 56-57). Controlled purchases provided evidence against Nava, Machado-Galeana, and anyone who assisted them during the purchase, but did not reveal evidence identifying suppliers, locations where drugs were kept or hidden, and methods of delivery or transportation. (*Id.* at 56-57).

With respect to physical surveillance, Courrege represented that physical surveillance is generally used to "confirm meetings and other suspected criminal activity," but it provides insufficient evidence to prove the purpose of these meetings and activities. (*Id.* at 57). However, when physical surveillance is combined with a wiretap, "the purpose of meetings takes on a new significance." (*Id.*). The subjects of this investigation are "extremely cautious" and aware of law enforcement surveillance, and they actively conduct counter-surveillance and "heat checks" to determine whether they are the subjects of physical surveillance. (*Id.* at 57-58). Courrege provided a few examples of "heat checks" and other counter-surveillance that Machado-Galeana and other persons associated with Nava had engaged in. (*Id.* at 58-60). While conducting physical surveillance, officers had also stopped a Ford F-150 truck associated with Machado-Galeana but had obtained little useful information, and further stops would risk alerting Nava and Machado-Galeana to the presence of law enforcement. (*Id.* at 61). However, physical surveillance conducted in conjunction with electronic surveillance would "achieve the objectives of the investigation and lead to the seizure of drugs and assets." (*Id.* at 62).

With respect to undercover agents, Courrege represented that undercover agents had successfully purchased large quantities of drugs from Nava and Machado-Galeana. (*Id.* at 62). However, there was "no evidence" that conducting additional purchases through undercover agents would permit agents to "move beyond" Nava and Machado-Galeana. (*Id.*). Courrege noted particularly that Nava had stated that he could provide up to ten pounds of

methamphetamine at a time and that intelligence gathering after buys had been limited for similar reasons to those previously described with respect to confidential sources. (*Id.*).

With respect to search warrants, Courrege represented that a single search warrant to install a GPS device on a vehicle had been executed during the investigation. (*Id.*). Although additional search warrants might provide "some evidence" of criminal activity, they would not be effective at achieving the overall goals of the investigation. (*Id.* at 62-63). Particularly, search warrants for locations used during the controlled purchases might result in the arrests of Nava and Machado-Galeana, but they would likely not result in the arrest of unidentified suppliers. (*Id.* at 63). Based upon Courrege's experience, Mexican nationals are "not likely" to cooperate following arrest, and the arrest of Nava and Machado-Galeana would probably not lead to the identification of other members of the organization. (*Id.*). A search warrant also might be rendered more effective in conjunction with a wiretap: intercepted communications could inform agents about the current location of contraband, and a search warrant could follow immediately. (*Id.*). Obtaining prior electronic communications is similarly an inadequate substitute for real-time interception, as information is received too late to make "adequate enforcement decisions" and direct agents to specific locations. (*Id.* at 64).

With respect to interviews, Courrege represented that no known members of the organization had been arrested, and interviews would produce insufficient information concerning the identities of all the persons involved in the conspiracy, sources of drugs, financing of drug purchases, and the identities of larger cocaine suppliers. (*Id.* at 64-65). Responses to interview questions would likely contain "a significant number of half-truths and untruths" that could divert or frustrate the investigation. (*Id.* at 65). Interviews would also risk alerting members of the conspiracy about the investigation. (*Id.*).

With respect to grand jury subpoenas, Courrege represented that subjects called to testify may invoke their Fifth Amendment privilege, grand jury immunity might foreclose prosecution of the most culpable people, and most of the individuals identified during the investigation participate in illegal activities and would likely lie under oath. (*Id.*). Courrege was not aware of any person who could be subpoenaed to provide "significant and truthful evidence" to prove the crimes identified, and the use of grand jury techniques would alert conspirators to the existence of the investigation and lead them to be "more circumspect" in their conduct. (*Id.*).

With respect to trash searches, Courrege represented that evidence obtained from such searches would not be sufficient to prosecute Nava and Machado-Galeana or their sources of supply and co-conspirators. (*Id.* at 66). There are also "great risks" associated with conducting trash searches, as Machado-Galeana's residence is in a high-crime neighborhood and neither Machado-Galeana's house nor Nava's house provide adequate cover and concealment to attempt trash searches. (*Id.*). The convenience store is located in a shopping center; because trash in shopping centers was often intermingled from several business, a trash search of the convenience store is unlikely to result in useful evidence. (*Id.*). Additionally, if agents were discovered conducting a trash search, it might be mistaken for illegal activity, and the investigation could be compromised and agents might be placed in danger. (*Id.* at 67).

With respect to other investigative techniques, Courrege represented that a GPS tracking device had been used in this investigation, but GPS location information only alerts agents that a vehicle may be located in an area used by members of a criminal organization. (*Id.* at 67). It does not inform the agents of who is present and what activity is occurring. (*Id.*). Since the GPS tracking device was installed in this investigation, the vehicle upon which it was installed had traveled to Lafayette, Louisiana and had not returned. (*Id.*). Machado-Galeana had been

observed driving four vehicles since the investigation began, and the likelihood of agents being discovered installing a tracking device was "great." (*Id.*). Some of the vehicles being used had temporary registrations, and agents had not been able to establish their use until after a drug sale. (*Id.*).

According to Courrege, agents had also installed a closed circuit television camera near Machado-Galeana's likely residence, but it was not in a position to "capture the exact apartment," and agents could only view parking lots near the building. (*Id.* at 68). There was "heavy" pedestrian traffic in the area, making it difficult to determine who may be affiliated with the organization. (*Id.*). All known transactions had occurred away from the residence, and the camera only had an outside view of the residence. (*Id.*).

A second closed circuit camera had been installed near the convenience store, but agents had been unable to determine whether activity observed was illegal or the "nature of the business inside." (*Id.*).

With respect to pen registers and other less intrusive forms of electronic monitoring, Courrege represented that pen register and trap and trace devices had been used in this investigation and would be used on an ongoing basis. (*Id.* at 69). However, these techniques provide lists of phone numbers of incoming and outgoing calls, but they do not establish the identities of all persons called or the content of conversations described. (*Id.*). Additionally, narcotics traffickers often purchase prepaid phones that are not required to list subscriber information; traffickers may also use fictitious names or the names of family members when subscribing to a phone service. (*Id.*).

With respect to mail cover requests, Courrege represented that this technique would not yield evidence demonstrating the role associates play in criminal activity, the location of

controlled substances, and the manner of supply and distribution of controlled substances. (*Id.* at 69-70). This technique requires a mail carrier otherwise not involved in the investigation to list senders, recipients, and addresses, and it risks intentionally or unintentionally disclosing the investigation. (*Id.* at 69-70).

Courrege represented that no wiretaps had previously been ordered in connection with this investigation. (*Id.* at 70).

## B. The Second Wiretap Application

In December 2014, the Government sought to intercept wire and electronic communications occurring over cellular telephone number (225) 266-2186, used by Machado-Galeana. (*See* Doc. 435-2 at 1-2). Chief Judge Brian A. Jackson approved the application, authorizing a thirty-day period in which to intercept communications. (*See id.* at 12, 68). Attached in support of the application was another supporting affidavit authored by Courrege. (*Id.* at 16). Courrege's affidavit generally averred to the same information regarding the background of the DEA's investigation and the ineffectiveness or dangerousness of other investigative techniques as the first application. It also made the following additional allegations:

The DEA learned from the first wiretap that Machado-Galeana supplies drugs for Nava's sales, not vice versa, and is in direct contact with suppliers, while Nava is not. (*Id.* at 33-34, 63). During calls intercepted by the first wiretap, Nava and Machado-Galeana referred to drugs being stored at a business owned by Romero. (*Id.* at 34-35). Moreover, Machado-Galeana's phone was in contact with approximately seven phone numbers during the first wiretap, including a number associated with Romero. (*Id.* at 34-35, 63). However, Romero's precise role was unclear and Nava, whose phone was the subject of the first wiretap, had no communications with

Romero. (*Id.* at 63-64). Machado-Galeana had also stated during an intercepted conversation that he was in contact with a supplier, possibly in California, with whom Nava had no contact. (*Id.* at 30, 64). The wiretap of Nava's phone was therefore insufficient to help clarify Romero's role or identify the supplier. (*Id.* at 64). Relatedly, Nava likely made "a nominal fee" for brokering drug transactions and was supplied with drugs by Machado-Galeana, but a wiretap of Machado-Galeana's phone would permit agents to follow drugs and drug proceeds that require laundering or smuggling out of the United States. (*Id.*).

Courrege's affidavit also noted that, according to Nava, drugs were coming from a Mexican cartel, and Machado-Galeana had a "Sinaloa" tattoo, "Sinaloa" being the name of a Mexican state and the name of a cartel operating there. (*Id.* at 25). Nava also stated during an intercepted call that he was working with "guys from Sinaloa." (*Id.*)

### C. The Search Warrants

In March 2015, the DEA applied for three search warrants, each of which was supported by another affidavit authored by Courrege. The affidavit asserted the following:

Between June 24 and September 24, 2014, undercover agents had purchased methamphetamine from Nava and Machado-Galeana on multiple occasions. (Doc. 435-3 at 6-9). During the investigation, agents observed Nava and Machado-Galeana repeatedly entering and exiting a building at 11634 W. Sherwood Meadow Avenue. (*Id.*). A closed circuit television camera had been installed at this location. (*Id.*). In December 2014, agents contacted the U.S. Postal Inspection Service regarding packages arriving to the Sherwood Meadow address from California; following a positive alert from a drug detection dog, a package containing nearly nine pounds of marijuana was discovered and seized. (*Id.* at 11-12). Agents conducted additional

surveillance of the Sherwood Meadow address and intercepted additional calls and text messages among Nava, Machado-Galeana, and others concerning drug transactions. (*Id.* at 12-19).

On February 24, 2015, Nava and an "unnamed co-defendant" were arrested at a hotel in Baton Rouge. (*Id.* at 20). Nava was carrying a small amount of heroin and a firearm. (*Id.*). The co-defendant explained that he sold methamphetamine under the direction of Nava and another Hispanic male that Courrege believed to be Machado-Galeana. (*Id.*). The co-defendant identified an apartment at the Sherwood Meadow address as one that Nava and others used to store drugs and drug proceeds. (*Id.*). The co-defendant reported that he had seen a large quantity of drugs in an ice chest inside the apartment on the previous day. (*Id.* at 20-21).

On February 26, 2015, agents observed Machado-Galeana and another Hispanic male leaving the Sherwood Meadow apartment carrying an ice chest. (*Id.* at 21). Agents saw Machado-Galeana place the ice chest in a car registered to Romero's mother and drive to 13822 Florida Boulevard, Suite 9, which was Romero's residence. (*Id.*).

On March 5, 2015, Nava bonded out of prison and contacted UC-1 to arrange a drug transaction. (*Id.* at 21-22). They arranged to conduct the sale at a gas station about a mile away from the Sherwood Meadow address. (*Id.* at 22). On March 12, 2015, Nava contacted UC-1 again, advising UC-1 that Nava would have the methamphetamine in an ice chest when he arrived. (*Id.* at 30).

On March 16, 2015, agents observed Nava and Machado-Galeana carrying an ice chest out of the Sherwood Meadow apartment and placing it in a car. (*Id.* at 30). Nava and Machado-Galeana drove to the Florida Boulevard address and placed the ice chest in a storage unit behind the building. (*Id.* at 30-31).

In November 2014, agents intercepted communications between Nava and Machado-Galeana in which Nava explained that he was leaving his home due to a dispute with his wife and moving to a motel. (*Id.* at 34). Nava also explained that he feared that police would find numerous firearms at his home. (*Id.*). Machado-Galeana suggested that Nava obtain a storage unit to store the firearms, and Machado-Galeana also expressed interest in storing drugs in a storage unit. (*Id.*). Later that month, agents observed Nava and Machado-Galeana traveling to a storage unit rental facility, spending several minutes in the facility's office, proceeding to a unit, and then leaving the property. (*Id.* at 34-35). Agents later confirmed that Machado-Galeana and Nava had rented Storage Unit 723. (*Id.* at 35).

On January 6, 2015, agents intercepted communications between Machado-Galeana and another individual in which the individual confirmed that he was in Baton Rouge with drugs. (*Id.*). Machado-Galeana agreed to meet at the convenience store. (*Id.*). After Machado-Galeana left the convenience store, agents intercepted a call during which Machado-Galeana confirmed that he now had drugs and would proceed to store them. (*Id.* at 36). Machado-Galeana traveled to Storage Unit 723 and "appeared to place" an object inside. (*Id.*).

Based on the foregoing, the Government sought and received a search warrant for the Sherwood Meadow apartment, (Doc. 435-3 at 1), the Florida Boulevard apartment and its associated storage unit, (Doc. 435-4 at 1), and Storage Unit 723, (Doc 435-5 at 1). While executing the search warrants, agents found methamphetamine, marijuana, scales, drug ledgers, weapons, ammunition, plastic bags, a padlock and keys, identification documents for Machado-Galeana, and other unspecified "documents." (Doc. 435 at 17-18).

## III.    DISCUSSION

### a.  Standard

A suppression hearing allows the court to make a preliminary determination regarding the admissibility of certain evidence allegedly obtained in violation of the defendant's constitutional rights under the Fourth Amendment. *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his [constitutional] rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, also known as the Wiretap Act, is codified at 18 U.S.C. §§ 2510—2522.  Section 2518(3), the portion of the Wiretap Act most relevant in this case, states:

> (3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting [. . .], if the judge determines on the basis of the facts submitted by the applicant that—
>
>> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>>
>> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>>
>> (c) *normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;*

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

(emphasis added). The probable cause required for a wiretap is identical to that required for an ordinary search warrant. *United States v. Green*, 2005 WL 1041205 at *2 (E.D. La. Apr. 29, 2005) (citing *United States v. Milton*, 153 F.3d 891, 894 (8th Cir. 1998)).

The "necessity requirement" of Section 2518(3)(c) "is intended to ensure that [f]ederal wiretap authorization procedures 'were not to be routinely employed as the initial step in criminal investigation.'" *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)); *see also United States v. Mingo*, 2014 WL 4443485 at *8-*9 (E.D. La. Sept. 9, 2014) (discussing the necessity requirement).

### b. Parties' Arguments

#### i. Defendants' Arguments

Defendants argue that, under Section 2518(3)(c), wiretaps are only appropriate where traditional investigative techniques have failed, are unlikely to succeed, or are too dangerous to attempt, and the wiretap applications in this investigation did not meet this standard. (Machado-Galeana's Motion, Doc. 416-1 at 7; Romero's Motion, Doc. 395-1 at 2). According to Defendants, the DEA's investigation had been underway for only three or four months and, in an attempt to characterize the investigation as one in which normal investigative techniques had failed, Courrege resorted to "conclusory language, boilerplate language, misrepresentations, and misstatements." (Doc. 416-1 at 7; *see also* Doc. 395-1 at 2 (wiretap applications consisted of "nothing more than voluminous 'fluff' that appears to address statutory concerns, but is nothing

more than boiler plate or conclusory language").  Throughout his Motion, Machado-Galeana repeatedly argues that Courrege's statements do not discuss the effectiveness of an investigative technique in this investigation, rather than investigations generally, and that the "necessity" requirement is not satisfied by stating either that a wiretap permits other investigative techniques to become more effective or that a particular traditional technique, in isolation, will be insufficient to achieve the investigation's goals.  (*See, e.g.*, Doc. 416-1 at 8-14.)

With respect to confidential sources, Machado-Galeana maintains that, despite Courrege's "misgivings" about confidential sources, a confidential source was the "wellspring of information" in this case.  (Doc. 416-1 at 8).  Furthermore, Courrege does not explain why additional confidential sources could not be developed.  (*Id.*).  Romero similarly argues that the use of confidential sources proved "fruitful" in the investigation and, although the investigation "evolved to no longer needing the confidential source," there is no reason to believe that agents could not continue to use the source or recruit others.  (Doc. 395-1 at 2-3).

Next, Machado-Galeana argues that controlled purchases also demonstrate that normal investigative techniques were "gain[ing] traction": the purchases were for successively larger quantities of drugs and permitted agents to increase the frequency of their contacts with the organization and the number of individuals they were in contact with.  (Doc. 416-1 at 9). According to Machado-Galeana, the relationship between Nava and the agents "seemed to be blossoming into one of trust."  (*Id.*; *see also* Doc. 419-3 (line sheets)).  Romero makes substantially the same arguments and further observes that agents were "able to even dictate quantity" during the transactions.  (Doc. 395-1 at 3).

With respect to physical surveillance, Machado-Galeana observes that, after documenting physical surveillance's shortcomings, Courrege goes on to list physical surveillance measures

taken and states that they have permitted agents to identify some vehicles used by the organization. (Doc. 416-1 at 10). Machado-Galeana also takes issue with the stop of the Ford F-150, arguing that it is unclear why the vehicle was stopped instead of being followed longer. (*Id.* at 10-11). Romero similarly argues that physical surveillance was "working and providing valuable information" in this case, including identifying vehicles on which GPS trackers had been or could be installed and revealing activities at Machado-Galeana's residence. (Doc. 395-1 at 3).

Machado-Galeana then argues that undercover agents were also effective in the investigation, reiterating that they were in "constant contact" with Nava, with whom they had developed a trusting relationship during the four months of the investigation. (Doc. 416-1 at 11-12). Romero argues that two undercover agents "effectively embedded themselves" within the organization and made "at least half a dozen" drug purchases in increasing quantities, suggesting that, with more time, their need for greater quantities would lead to higher level producers. (Doc. 395-1 at 3-4).

Machado-Galeana maintains that Courrege's statements regarding search warrants were "particularly fraught with conclusory statements and misleading information." (Doc. 416-1 at 12). Machado-Galeana also observes that Nava is not a Mexican national, so Courrege's statement regarding the likely behavior of Mexican nationals does not apply to him, and that Nava in fact cooperated following his arrest. (*Id.*). Romero argues that the search warrants obtained in this case were "quite effective" and were obtained via physical surveillance of suspects and their residences during drug transactions. (Doc. 395-1 at 4).

Machado-Galeana also argues that Courrege was likely unaware of individuals who could be subpoenaed because this investigation was still "in [its] infancy;" "[i]f the death of

information provides the required necessity, the [G]overnment is incentivized to gather little information and ask for wiretaps almost immediately." (Doc. 416-1 at 12-13). Romero argues that "many drug cases" involve cooperating witnesses and that, in this case, Nava and other co-defendants appeared "eager" to cooperate. (Doc. 395-1 at 4).

Machado-Galeana argues that Courrege provides no support for his conclusion that a trash search would be unsuccessful or that residents might mistake a trash search for illegal activity. (Doc. 416-1 at 13). He also argues that use of a GPS tracking device, combined with other surveillance techniques, allows agents to track suspect movements and determine the possible locations of drug stashes, drug suppliers, and drug sale locations. (*Id.* at 14). Machado-Galeana acknowledges that a wiretap may make it "easier" to accomplish the goals of the investigation, but this does not satisfy the necessity requirement. (*Id.*).

With respect to pen registers, trap-and-trace devices, and toll analyses, both Machado-Galeana and Romero argue that these techniques were effective in this case, permitting agents to identify Machado-Galeana and Romero. (*Id.* at 14-15; Doc. 395-1 at 4). Finally, Machado-Galeana argues that Courrege's explanation of mail cover requests is boilerplate and does not demonstrate necessity. (Doc. 416-1 at 15).

Additionally, Machado-Galeana argues that the second wiretap application is a "carbon copy" of the first wiretap application in most relevant respects and does not meet the necessity requirement "standing on its own." (*Id.* at 16-17).[3]

During the April 11, 2017 hearing, Defendants generally reiterated their arguments in support of the Wiretap Motions, observing that the investigation was a "new operation" and that

---

[3] The Wiretap Motions also requested a hearing pursuant to *Franks v. Delaware*, 483 U.S. 154 (1978), arguing that Courrege's affidavits contained false statements and omissions made with reckless disregard for the truth. (Doc. 416-1 at 18-20; Doc. 395-1 at 4). The Court denied this request for reasons discussed on the record during the April 11, 2017 hearing. (Doc. 450 at 1; Hrg. Tr. at 24:20-25:5).

there was no showing that using traditional investigative techniques would have prevented agents from going further up the "food chain." (Hrg. Tr. at 27:25-34:9). Defendants also emphasized that, on one occasion, Nava had asked whether an undercover agent wanted to "meet [his] dude" or continue working with Machado-Galeana; the agent asked to continue to work with Machado-Galeana and made "no effort" to pursue this additional lead. (*Id.* at 33:17-24; *see also* Doc. 419-3 at 20). Machado-Galeana and Romero's post-hearing briefs contend that "every normal investigative procedure utilized was working": the DEA used undercover agents, surveillance, search warrants, and guilty pleas effectively during this investigation. (Doc. 457 at 1-2; Doc. 461 at 1-3).

### ii. The Government's Arguments

The Government argues that the wiretap applications provided an "ample basis" to conclude that traditional investigative techniques would not be successful in the DEA's investigation. (Doc. 435 at 22). When agents applied for the wiretaps, they believed that they were dealing with a Mexican cartel capable of delivering pounds of high-grade methamphetamine. (*Id.* at 22). Agents did not "rush to get a wiretap" as a first measure, but, for the reasons discussed in Courrege's affidavits, traditional investigative techniques provided limited access to the organization and its members. (*See id.* at 22-25). Although agents were purchasing "ever-increasing amounts" of drugs, they were not accomplishing the goals of their investigation because of the manner in which the organization operated. (*Id.* at 23-24).

The Government also argues that Romero would not have been identified as a criminal associate absent the first wiretap, but his role remained uncertain before the second wiretap. (*Id.* at 24). Moreover, using traditional investigative techniques had led agents to the "wrong conclusion" about the roles Nava and Machado-Galeana played in the organization. (*Id.* at 24-

25). The Government also argues that it was permissible for Courrege's affidavits to contain statements about his general investigative experience in the "type of crime involved and the particular facts of the case at hand," and the affidavits were made in good faith in reliance on his experience and contained more than a "barebones" recitation of traditional investigative techniques and their effectiveness. (*Id.* at 26).

During the hearing, the Government reiterated its arguments in support of the wiretaps, further observing that the two applications were similar because Nava and Machado-Galeana worked together out of the same locations, not because agents "paste and copied." (Hrg. Tr. at 25:12-27:19). The Government also argued that agents reasonably concluded, based on their experience with gang investigations, that continuing to use controlled buys or meeting Nava's "dude" would not allow them to "move up" the organization because lower-level distributors would not risk being "sidestep[ped]" and losing money by introducing agents to a higher-level distributor. (*Id.* at 34:12-36:19). In its post-hearing brief, the Government argues that wiretaps were not sought as an "initial step" in this investigation and its burden to prove necessity is not "great." (Doc. 460 at 3). The Government also observes that Nava was "already supplying" customers with ten pounds of drugs at a time, and Courrege therefore reasonably stated that Nava would continue to supply drugs "following the same routine" and without introducing agents to higher-level sources. (*Id.* at 4-5).

### c. Analysis

As discussed above, Section 2518(3)(c) provides that a wiretap may be authorized where "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." A request for a wiretap need not "show a comprehensive exhaustion of all possible techniques;" the requirement is intended to ensure that

wiretap authorization procedures are not "routinely employed as the initial step in criminal investigation." *Hyde*, 574 F.2d at 867. The Fifth Circuit further explained:

> We first note that [Section 2518(c)] must be read in a common sense fashion. [It is] "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." (citation omitted.) [Its] purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." (citation omitted.) [*United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974)].

> In short, courts will not invalidate a wiretap order simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not. It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.

*Id.*; *see also United States v. Guerra-Marez*, 928 F.2d 665, 669-70 (5th Cir. 1991) ("[C]ourts are reluctant to impose their hindsight upon law enforcement agencies, and the proponent of the application need not establish that 'every other imaginable mode of investigation would be unsuccessful.'" (quoting *United States v. Diadone*, 558 F.2d 775, 778 (5th Cir. 1977))).

In *Guerra-Marez*, the Fifth Circuit upheld as valid a wiretap authorization related to an extensive drug distribution operation. 928 F.2d at 668, 671. As the Fifth Circuit observed, although undercover drug buys, surveillance, trash searches, and the use of a cooperator were attempted and initially proved "fruitful," "gaps in the government's case were evident." *Id.* at 668-69, 671. Specifically:

> [T]he quantity of heroin obtained through undercover drug buys was too small to prove a large-scale conspiracy. Some members of the ring became conscious of surveillance, frequently eluding the agents or refusing to deal with them. The agents' efforts to identify [the head of the trafficking ring's] suppliers were also frustrated by their inability to obtain advance warning of major incoming shipments of drugs. Although [the cooperator] occasionally witnessed large heroin transactions, such viewings were accidental and uncorroborated. The government could have reasonably concluded that attempting to elicit further

> information through [the cooperator] would have aroused the suspicions of other
> participants, thus endangering both its informant and the investigation.

*Id.* at 671; *see also United States v. Collins*, 972 F.2d 1385, 1412 (5th Cir. 1992) (wiretap application met necessity requirement in part because physical surveillance "would show that meetings were taking place but would not supply the content of those meetings"). The Fifth Circuit has repeatedly ruled that an affidavit can meet the necessity requirement by providing reasons to believe that informants or undercover agents cannot infiltrate a trafficking organization at high enough level to prosecute the organization's managers. *United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995) (citing *Guerra-Marez*, 928 F.2d at 671; *United States v. Webster*, 734 F.2d 1048-1055 (5th Cir. 1984)).

This Court has previously considered the necessity requirement in *United States v. Edwards*, 124 F. Supp. 2d 387 (M.D. La., Aug. 22, 2000) (Polozola, C.J.). There, the Court ruled that the necessity standard was met because the affidavit gave a detailed account of the investigative techniques used by the agents and asserted that a wiretap was necessary due to "(1) the covert nature of the offense; (2) the nature of the relationship between the parties; (3) the lack of direct physical evidence of crimes of the nature of those alleged; and (4) the lack of sufficient detail from pen registers alone." *Id.* at 400-01.

Here, under the broad "common sense" approach required, the Court is satisfied that the affidavits in support of the wiretap applications met the necessity requirement. The goal of the investigation was not to arrest and prosecute Nava or Machado-Galeana, but to investigate and disrupt an apparently wide-ranging, sophisticated, and international drug trafficking conspiracy. As described in Courrege's affidavits, although traditional investigative techniques provided access to Nava and Machado-Galeana and evidence that might permit their conviction, agents reasonably believed that these techniques would not permit agents to move "up the food chain"

consistent with the goals of the investigation. *See, e.g.*, *Krout*, 66 F.3d at 1425. Defendants contend that agents were developing a trusting relationship with Nava and Machado-Galeana but, from early in the investigation, Nava represented that he could supply "any quantity of methamphetamine [UC-1] wished to purchase," (Doc. 435-1 at 29), arguably obviating the need for Nava or Machado-Galeana to introduce agents to suppliers regardless of the strength of their relationship. Agents could reasonably have concluded that, once the general contours of the working relationship among Nava, Machado-Galeana, and the undercover agents were established, the investigation would have stalled at these lower-level traffickers. This was sufficient to meet the necessity requirement. *See Krout*, 66 F.3d at 1425; *Guerra-Marez*, 928 F.2d at 671; *Webster*, 734 F.2d at 1048-1055.

Defendants also object at length to the use of "boilerplate" language in Courrege's affidavits. However, although Courrege's affidavits contained some generally applicable "boilerplate" statements, they also contained case-specific information regarding the use of traditional investigative techniques, including the extent to which they had been successfully attempted, why Courrege believed them insufficient to the overall needs of the investigation, and how they would be more effective when combined with a wiretap. (*See* Doc. 435-1 at 53-70). An agent's affidavit can meet the necessity requirement through a combination of boilerplate statements and case-specific information. *See United States v. Madrid*, 916 F. Supp. 2d 730, 755 (W.D. Tex. Sept. 25, 2012) (citing *United States v. Campos*, 541 F.3d 735, 749 (7th Cir. 2008); *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)).

Defendants further contend that agents left some leads, like Nava's "dude," unexplored and that traditional investigative techniques, particularly undercover buys and search warrants, have led to the discovery of much of the evidence obtained in this action. (*See* Doc. 416-1 at 8-

16; Doc. 395-1 at 2-4). First, the Court notes that some of the traditional methods used in this action were made more effective through the use of a wiretap; indeed, the affidavit in support of the search warrants described conversations that, in conjunction with other techniques, ultimately led agents to surveil and obtain probable cause to search several locations. (*See, e.g.,* Doc. 435-3 at 11-30). Although not directly relevant to whether a wiretap was "necessary," this undermines Defendants' apparent conclusion that, because traditional investigative techniques resulted in the discovery of evidence after the wiretaps were in place, these techniques alone were sufficient to the needs of the investigation.

Regardless, Defendants' evaluation is post hoc, speculative, and depends substantially on developments that agents were not in a position to foresee, especially the information obtained from the unnamed co-defendant following the February 24, 2015 arrest. As the Fifth Circuit has cautioned, courts will not invalidate a wiretap order "simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not." *Hyde*, 574 F.2d at 867. An affidavit need only "explain[] the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves." *Id.* As discussed above, Courrege's affidavits did so.

Additionally, with respect to the second wiretap application, it is true that the second application is virtually identical to the first in many respects. (Doc. 416-1 at 16-17). This is unsurprising, however, as it was related to the same investigation and its allegations of probable cause were supported by background information that was also relevant to the first application. Defendants' characterization of the duplicative allegations as "attempting to shoehorn the investigatory work conducted before applying for the [first wiretap] into the application for [the second wiretap]" is therefore inapt. *Cf. Madrid*, 916 F. Supp. 2d at 755 ("[T]he Government is

not prohibited from using boilerplate language as long as it also provides additional new information in each successive affidavit, which is sufficient to justify the issuance of each of the wiretap authorizations."); *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) ("While the several affidavits for the various wiretaps involved may have relied on the same facts, their recitation was not boilerplate."). There is also no evidence that the effectiveness of traditional investigative techniques was meaningfully different for the first and second applications. Moreover, the second application contained statements demonstrating the need to tap Machado-Galeana's phone in addition to Nava's, including particularly statements about the California supplier and the need to investigate Romero and establish his role in the conspiracy. (Doc. 435-2 at 33-35, 63-64).

In short, the necessity requirement is to be applied in a "common sense" way, and the Fifth Circuit has characterized the requirement as designed to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," "inform the issuing judge of the difficulties involved in the use of conventional techniques," and ensure that wiretaps are not "routinely employed as the initial step in criminal investigation." *Hyde*, 574 F.2d at 867. Courrege's affidavits met this standard.

## IV.    CONCLUSION

Accordingly, **IT IS ORDERED** that the Wiretap Motions (Docs. 395, 416, 419) are **DENIED**.

Signed in Baton Rouge, Louisiana, on October 13, 2017.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**